**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| 8 ERIE ST. JC LLC,<br><br>    Plaintiff,<br> v.<br><br>CITY OF JERSEY CITY, et al.,<br><br>    Defendants. | Civil Action No. 19-9351 (SDW) (JRA)<br><br>**OPINION**<br><br>July 12, 2024 |

**WIGENTON**, District Judge.

Before this Court are Defendants City of Jersey City, Jersey City Council, Jersey City Planning Board, and Jersey City Redevelopment Agency's (collectively, "Defendants") Motions for Summary Judgment (D.E. 145–47 ("Motions")) pursuant to Federal Rule of Civil Procedure ("Rule") 56. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' Motions are **GRANTED**.

**I. FACTUAL AND PROCEDURAL HISTORY**[1]

 **A. Facts**

On or about May 13, 2015, the City of Jersey City ("the City") enacted two ordinances[2] ("Ordinances") that required buildings in certain parts of Downtown Jersey City to limit "formula

---

[1] Citations to "D.E." refer to the docket entries for the Complaint and the parties' motion papers, including briefs, affidavits, declarations, and exhibits attached thereto. Facts cited in this opinion are drawn from Defendants' Statement of Material Facts, (D.E. 145-2, 146-1), Plaintiff's Supplemental Statement of Material Facts, (D.E. 148-1), Plaintiff's Response to Defendants' Statement of Material Facts, (D.E. 148-2), Defendants' Joint Response to Plaintiff's Supplemental Statement of Material Facts, (D.E. 153-1), and the record documents cited therein. The facts are undisputed unless noted otherwise.

[2] The two ordinances are Ordinance nos. 15-052 and 15-053. (D.E. 145-1 at 7.)

businesses"—commonly known as "chain stores"—to no more than thirty percent of their ground floor commercial area. (D.E. 145-5 at 76–90.) Plaintiff 8 Erie St. JC LLC ("Plaintiff"), a New Jersey limited liability company with its principal place of business located in Jersey City, New Jersey, is the owner of a property located at 8 Erie Street, Jersey City, New Jersey, 07302, which was one of the many commercial properties subject to the Ordinances' restriction. (*Id.* at 89; D.E. 148-1 at 3 ¶ 1.) At all relevant times, Alfonso Carrino was Plaintiff's principal and managing member. (D.E. 145-2 at 1 ¶ 1.)

In 2015, a non-formula business restaurant named Talde began renting and operating in an approximately 3,500 square-foot ground floor commercial space at 8 Erie Street ("the Property"). (*Id.* at 2 ¶¶ 6–7; D.E. 145-5 at 101, 21:11.) Plaintiff began looking for a new tenant for the Property in early 2019 while Talde was still occupying the Property.[3] (D.E. 145-5 at 110, 56:20-25; D.E. 148-1 at 34 ¶ 130.) Talde occupied the Property until about August 2019. (D.E. 145-2 at 2 ¶ 8; D.E. 145-5 at 112, 63:18-22; *id.* at 169.)

Arto Ozgun, an investment partner and co-owner of RMA Holding, which owns six Bareburger locations and the franchise rights to open Bareburger restaurants in New Jersey, learned through his broker in 2019 that the Property was available for rent. (D.E. 145-5 at 147, 12:1-11, 13:1-7.) Sometime between January 1 and July 30, 2019, Ozgun went to see the Property during which he expressed to Plaintiff his interest in leasing it. (D.E. 145-2 at 5 ¶ 22; D.E. 145-5 at 149, 20:4-15.)

---

[3] Plaintiff alleges, and Defendants dispute, that it began seeking a new tenant because by early 2019 Talde was having financial difficulties and had not paid rent. (*See* D.E. 148-1 at 34 ¶¶ 128–29.) Plaintiff has not provided any evidence, other than Carrino's own testimony, to support this assertion. Other than confirming that Talde had a lease, Carrino could not recall how long Talde's lease was, the amount of rent Talde paid, or whether Plaintiff sought to recover rent owed by Talde. (D.E. 145-5 at 108, 49:10-18; *id.* at 109, 51:24-52:3.)

On or about March 19, 2019, Plaintiff's attorney sent a letter to the City demanding that "the City immediately repeal the Ordinance[s]," but the letter does not say whether the Ordinances prohibited Plaintiff from leasing the Property to Bareburger. (D.E. 148-16 at 2–3.) Plaintiff filed the instant suit on April 5, 2019. (D.E. 1.) On May 8, 2019, the City repealed the Ordinances. (D.E. 145-5 at 92–94.) Ozgun and Plaintiff continued to negotiate Bareburger's potential lease of the Property after the Ordinances were repealed. (D.E. 145-2 at 4–7.) In addition to leasing the commercial space at the Property to Bareburger, Carrino wanted to sell the liquor license it had purchased for Talde as well as the contents of the restaurant to Bareburger as part of the deal. (D.E. 145-5 at 105, 35:6-21; *id.* at 150, 25:2-8; *id.* at 169–71.)

On July 30, 2019, Ozgun sent two letters of intent to Plaintiff: the first letter set forth proposed lease terms for the Property ("Lease LOI"); the second letter set forth terms for the purchase of Talde's business and liquor license ("Purchase LOI"). (*Id.* at 165–71.) The Lease LOI states that the anticipated delivery of possession and/or occupancy date for Bareburger was October 2019. (*Id.* at 166.) At this time, Ozgun understood that "there was no restriction for [him] to negotiate" for the lease of the Property. (*Id.* at 155, 45:9-10.)

On August 21, 2019, Ozgun's broker sent a revised letter of intent for the purchase of the liquor license to Carrino. (*Id.* at 175.) On September 18, 2019, Carrino indicated in an email to Ozgun that they had met the day before to "discuss the possibility of Bare[b]urger renting" the Property, that they were a "little a part [sic] on the numbers," and that he had in mind a different "monthly 'dollar amount.'" (*Id.* at 173.) In the same email, Carrino also provided a list of proposed terms to Ozgun. (*Id.*)

3

Ozgun continued his negotiations with Carrino. On September 21, 2019, Carrino asked Ozgun over email to consider increasing his "key money"[4] offer and recommended that Bareburger obtain financing from a bank called ConnectOne to "get the deal done." (*Id.* at 175–76.) On September 25, 2019, Ozgun advised Carrino that ConnectOne would not provide financing to Bareburger. (*Id.* at 182.)

On October 15, 2019, Carrino told Ozgun via text messages that the bank would not provide financing and that "[r]espectfully, [we] suggest you look at other possibilities." (*Id.* at 185.) On October 19, 2019, Ozgun conveyed to Carrino that he might be able to provide additional cash and asked to speak with Carrino. (*Id.* at 186.) On October 20, 2019, Carrino advised Ozgun by email that Plaintiff had accepted an offer from a different restaurant that was "very close to our original asking price," and that the parties would sign the lease contract the same week. (*Id.* at 179.) On February 3, 2020, Plaintiff executed a lease with a different restaurant named Hudson Hound, which agreed to pay more rent than Bareburger. (D.E. 148-1 at 44 ¶ 179.)

**B. Procedural History**

Plaintiff filed the instant lawsuit on April 5, 2019, (D.E. 1), and the case was reassigned to this Court on September 19, 2023 from former Judge John Michael Vazquez. (D.E. 142.) In two prior decisions, (D.E. 56, 77), Judge Vazquez dismissed with prejudice Plaintiff's: facial challenge to the Ordinances under the Commerce Clause as barred by the statute of limitations; and claim for declaratory and injunctive relief as moot. Plaintiff filed the operative Second Amended Complaint ("SAC") on March 22, 2021. (D.E. 81.) The SAC asserts as-applied challenges to the

---

[4] "When renting commercial properties in which the premises already contains various trade-fixtures, equipment, electric, and plumbing (items typically left when a former tenant vacates), such items have a value above the typical rent for an empty 'vanilla shell' premises. The landlord would charge the tenant key money in order for the tenant to have the right to use and take over all of the existing equipment." *Key Money*, Wikipedia, https://en.wikipedia.org/wiki/Key_money#:~:text=Key%20money%20is%20one%20of,a%20bribe%20to%20a%20landlord (last visited July 7, 2024).

Ordinances' legality under federal and state law.[5]  On or about April 23, 2021, Defendants filed Answers.  (D.E. 84–86.)  Following discovery, Defendants filed the instant Motions on November 6, 2023, pursuant to Rule 56, (D.E. 145–47), and the parties timely completed briefing.  (D.E. 148, 153–55.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial."  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing Fed. R. Civ. P. 56(e)).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325).  Further, the nonmoving party

---

[5] The SAC, however, still brings a facial challenge to the Ordinances (Count I) and a claim for declaratory and injunctive relief (Count VII) and demands an order declaring the Ordinances invalid and of no force or effect (Count IV).  For the same reasons discussed in Judge Vazquez's February 19, 2021 opinion, (D.E. 77), these issues shall remain dismissed with prejudice and will not be considered by this Court.  *See 8 Erie St. JC LLC v. City of Jersey City*, No. 19-9351, 2021 WL 689147, at *3 n.3 (D.N.J. Feb. 19, 2021).

is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Instead, the district court "must view all of the facts in the light most favorable to the non-moving party," who is entitled to "every reasonable inference that can be drawn from the record," and if "there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Reedy v. Evanson*, 615 F.3d 197, 209 (3d Cir. 2010) (citations omitted).

### III.   DISCUSSION

#### A. Article III Standing (Counts I & II)

Defendants argue that Plaintiff's claims must be dismissed because the evidence in the record confirms that the Ordinances did not prevent Bareburger from leasing the Property or cause Plaintiff to suffer damages. Although Defendants' argument is not explicitly framed as a standing issue, this Court construes it as such. After examining the record, this Court concludes that Plaintiff lacks standing and thereby dismisses the case.

Article III of the United States Constitution limits the jurisdiction of federal courts to resolving "Cases" or "Controversies." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) (citing U.S. Const. art. III, § 2). "Absent Article III standing, a federal

court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006).

Article III standing is a "jurisdictional issue" that "can be raised at any time, by either a party or by the court." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014) (internal quotation marks and citations omitted). Federal courts have a "continuing obligation" to assure themselves that they have jurisdiction and thus may raise standing issues *sua sponte*. *Seneca Res. Corp. v. Twp of Highland*, 863 F.3d 245, 252 (3d Cir. 2017). Standing "can never be waived, even when parties fail to raise [it]." *Potter v. Cozen & O'Connor*, 46 F.4th 148, 156 (3d Cir. 2022).

To establish standing, a plaintiff must prove three elements: (i) a plaintiff suffered an "injury in fact"[6] that is "concrete and particularized"[7] and "actual or imminent, not conjectural or hypothetical"; (ii) that the injury is fairly traceable to the challenged action of the defendant;[8] and (iii) that the injury is likely to be redressed by a favorable judicial decision. *Spokeo*, 578 U.S. at 338–39 (citations omitted).

A plaintiff "must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (internal quotation marks omitted). At summary judgment, a plaintiff "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" to establish

---

[6] An "injury in fact" is "an invasion of a legally protected interest." *Spokeo*, 578 U.S. at 339.

[7] A "concrete" injury means "it must actually exist," and it is real and not abstract. *Id.* at 340. A "particularized" injury means the injury must affect the plaintiff in "a personal and individual way." *Id.* at 339. (citation omitted).

[8] The traceability requirement is "akin to but-for causation, not proximate causation," and "[t]here may be more than one but for cause of a loss." *Adam v. Barone*, 41 F.4th 230, 235 (3d Cir. 2022) (finding that the traceability requirement is satisfied when both Plaintiff's and Defendants' actions were but-for causes of Plaintiff's injury). Having considered the legal standard on traceability, this Court need not address Defendants' causation argument as Plaintiff has not sufficiently shown injury in fact.

standing. *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)).

    1. *Injury in fact*

Plaintiff asserts that Bareburger agreed to lease the Property for $175,000 a year in February 2019 and commence rent payment sixty days after taking possession of the Property, which Plaintiff claims it was ready to deliver immediately. Therefore, Plaintiff contends that, if the Ordinances were not in effect, it would have entered a lease with Bareburger in February 2019 and begun receiving rent in May 2019. Plaintiff eventually executed a lease with another restaurant in February 2020 for $18,000 a month or $216,000 a year, and the new tenant began rent payment on September 1, 2020. (D.E. 148 at 20.) Plaintiff thereby seeks $278,000 in damages, which includes $233,000 of lost rent from May 2019 through September 2020 and $45,000 in attorneys' fees.[9]

Plaintiff's alleged economic injury in the form of lost rent is too speculative to meet the injury-in-fact requirement for Article III standing. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (stating that a plaintiff fails to show "injury-in-fact" when it is based on a "chain of contingencies" or "mere speculation.") Viewing the facts in the light most favorable to Plaintiff, this Court has found no evidence of a lease agreement for any specified amount of rent between Plaintiff and Bareburger in February 2019. The relevant case law and the record evidence will be discussed in turn.

    a. <u>A property owner's standing to challenge a zoning ordinance limiting the permissible uses of property</u>

---

[9] Because "litigation expenses alone do not constitute damage sufficient to support standing," this Court will only address Plaintiff's arguments for lost rent in its standing analysis. *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 79 (3d Cir. 1998).

While no binding authority directly addresses a property owner's standing to challenge municipal ordinances that limit the footprint of certain types of commercial tenants, the Third Circuit's decision in *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131 (2009) provides useful guideposts on whether Plaintiff's alleged economic injury—lost rent from Bareburger between May 2019 to September 2020—is too speculative to sustain Article III standing.

In that case, plaintiff Toll Brothers, a real estate developer who had an exclusive option contract to purchase a parcel of land for development, challenged a municipal zoning ordinance. When Toll Brothers entered the option contract, defendant Township of Readington's zoning allowed for single-family residential and general office development on the parcel; however, after Toll Brothers applied for approval of its development plans, the township denied the application, rezoned the entire parcel, and limited its uses to farms, open space, and parks. *Toll Bros.*, 555 F.3d at 135. Toll Brothers then sued the township, seeking injunctive relief and damages. *Id.* at 136.

Holding that Toll Brothers had standing to sue, the Third Circuit compared the case with two "instructive" Supreme Court cases—*Warth v. Seldin*, 422 U.S. 490 (1975) and *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). *Id.* at 139. The Third Circuit reasoned that, like the plaintiff in *Arlington Heights*, Toll Brothers had "detailed and specific" plans for the restricted property, spent "substantial sums in planning its proposed developments," sought approval from the municipality for its proposed development, and showed that its front-end investments into the restricted property remained "worthless" so long as the challenged restrictive zoning ordinance stayed in effect. *Id.* at 140. On the other hand, the Third Circuit found that, unlike Toll Brothers, the plaintiff in *Warth*, a home-builders association, failed to show that the challenged ordinance prevented the development of any of its members'

projects or that any of its members had applied for a building permit or variance with respect to any project impacted by the ordinance at issue. *Id.* at 140.

Here, Plaintiff has presented no evidence that: it had any detailed or specific plan to rent the Property to Bareburger in February 2019; it had sought a variance, exception, or any approval from the City to permit Bareburger to occupy the Property; Bareburger had to violate the Ordinances—*i.e.*, occupy more than thirty percent of the leasable ground floor area—to have a viable business operation at the Property; or the Ordinances rendered any of its investment into the Property worthless.

      b. <u>Evidence in the record</u>

The record's silence on the existence of any agreement before the repeal of the Ordinances speaks volume. The earliest documentation of any discussion to lease the Property between Plaintiff and Bareburger are the July 2019 Lease LOI and Purchase LOI. Far from being ready to execute a lease in February 2019, the record shows that Plaintiff and Bareburger continued to negotiate material terms after July 2019. (D.E. 145-5 at 169–86.) For example, Ozgun testified that the Lease LOI was not "the final deal" and that he and Carrino had "a couple of back and forths [sic]" with regard to revisions to Bareburger's lease proposal but "never reached a deal." (*Id.* at 150, 24:4-15.)

Similarly, on September 18, 2019, Carrino conveyed to Ozgun via email that they were "a little a part [sic] on numbers" and proposed a list of terms, including rent discounts, the sale of Talde's liquor license, and key money that was to be paid to Plaintiff. (*Id.* at 173.) Three days later, Carrino communicated to Ozgun that they "have agreed on the rent and [liquor license] at $350,000," and that Carrino "would like to see the key money at [$500,000], but [he] will accept $450,000" to "get the deal done." (*Id.* at 175.) Email and text messages from Carrino also show

that he and Ozgun continued to discuss key money and Bareburger's ability to secure additional financing from a bank well into October 2019.

When asked about the reason Plaintiff purchased a liquor license for the Property, Carrino answered: "We wanted to be able to rent to a restaurant, a good restaurant, and in order for restaurants to be successful, they need to be selling liquor. We bought it ahead of time with the intent of selling it to someone who operated . . . the space." In other words, the transfer of Talde's liquor license to the next tenant was an important part of the deal for Plaintiff. In an email dated September 21, 2019, Carrino informed Ozgun that "we engaged our attorney last week to have the [liquor license] transferred from Talde back to our LLC. It will facilitate an easy transfer / sale to you." (*Id.*) It defies logic to believe that Plaintiff and Bareburger would continue to negotiate the liquor license in September 2019 if they already had an agreement in February 2019.

All the negotiations eventually ended when Plaintiff walked away from Bareburger and moved forward with another restaurant. Ozgun testified that there was a "big gap between what [he] was willing to pay and what [Carrino] was willing to sell for" and that the Ordinances "had nothing to do with [him] not renting [the] space at 8 Erie Street." (*Id.* at 150, 25:19-21; *id.* at 153, 34:15-16.) In addition, Ozgun said that he learned about the Ordinances from his broker in or about 2017, (*id.* at 151, 29:13-18), and that he would not have begun negotiation with Carrino when the Ordinances were in effect. (*Id.* at 152, 33:22-25 ("[I]f [the Property] was in the formula business area, I wouldn't even have been negotiating with [Carrino] for this space because I couldn't have opened a Bareburger restaurant there.").) Ozgun's testimony further supports the conclusion that there was no agreement to lease the Property in February 2019.

In sum, there is no evidence to support any inference that Plaintiff and Bareburger had reached an agreement to lease the Property for $175,000 a year. They could not have been ready

11

to enter a lease in February 2019 as the record shows that they continued to negotiate material terms in September and October 2019.

Plaintiff cites the following exchanges from Ozgun's deposition to support its argument that it had an agreement in principle with Bareburger in February 2019:

> Q: And all of those terms, the price, the duration, all of that was subject to if Mr. Carrino could get the formula business ordinance lifted; right?
>
> Ozgun: Correct.
>
> Q: And, so, when he did get the restrictions lifted, you took those terms that were subject and conditioned upon that and you put it in a Letter of Intent, you send it to Mr. Carrino's broker; correct?
>
> Ozgun: Yes.

(*Id.* at 159, 59:1-13.) Upon reviewing Ozgun's deposition transcript, however, this Court finds that the evidence cited by Plaintiff was taken out of context. Plaintiff's counsel asked Ozgun specifically about whether he had any discussion of the lease terms in the Lease LOI dated July 30, 2019 with Carrino:

> Q: Okay. So, you can't rule out these are the same terms that you had been discussing with Mr. Carrino's broker in *the month before*; correct?
>
> Ozgun: Correct.

(*Id.* at 158, 57:19-23 (emphasis added).) The evidence Plaintiff misleadingly cites to, in fact, shows that Ozgun discussed the terms contained in the Lease LOI with Plaintiff in or about June 2019, not in February 2019. This is consistent with Ozgun's recollection that he learned about the Property for the first time "a couple of months before" July 30, 2019. (*Id.* at 148, 16:3-6.) Therefore, Bareburger could not have had an agreement for leasing the Property with Plaintiff in February 2019.

Carrino's deposition testimony also contradicts Plaintiff's position:

> Q: All right. Well, the letter of intent was dated July 30th of 2019. Prior to that date, for how long were negotiations going on between the plaintiff and Bareburgers before the [letter of intent] was issued?
>
> Carrino: I would estimate *a month and a half maybe*, an estimate.

(*Id.* at 121, 101:8-14) (emphasis added). Carrino's testimony is consistent with Ozgun's recollection that negotiations between Bareburger and Plaintiff began in or about June 2019, not February 2019.

Even if there was an agreement in principle in February 2019 to lease the Property for $175,000 a year, Plaintiff has not presented any evidence that it was able to timely deliver possession of the Property to Bareburger to trigger Bareburger's obligation to commence rent payment in May 2019. For example, Carrino testified that it was on or about August 12, 2019, when Talde removed its possessions from and stopped using the Property. (*Id.* at 112, 63:14-22.) When describing a meeting with Bareburger that occurred at the Property prior to July 30, 2019, Carrino testified that Talde had expressed concerns about losing its employees to other restaurants if they saw Carrino trying to re-rent the space, suggesting that Talde's employees were still working at the Property when this meeting occurred. (*Id.* at 121–22, 101:23-102:7.)

The Lease LOI and Purchase LOI also confirm that Talde was occupying the premises on or about July 30, 2019. The Lease LOI states that the Property was "currently occupied by Talde." (*Id.* at 165.) Similarly, the Purchase LOI states that "[e]xisting tenant (Talde) shall vacate the premises within thirty (30) days of the closing." (*Id.* at 170.) In sum, Plaintiff was not ready to deliver possession of the Property to Bareburger in February 2019 as the evidence clearly shows that Talde occupied the Property at least through July 2019.

13

As discussed above, viewing the facts in the light most favorable to Plaintiff, this Court finds that Plaintiff has not sufficiently shown concrete and non-speculative injury to confer Article III standing. Plaintiff's claims are hereby dismissed with prejudice.

2. *Traceability/Causation*

Plaintiff lacks standing to sue Defendants Jersey City Planning Board ("JCPB") and Jersey City Redevelopment Agency ("JCRA"). The parties do not dispute that the Ordinances were adopted by the Jersey City Council. Plaintiff does not allege, and there is no evidence showing, that either the JCPB or JCRA had denied an application related to Bareburger's lease of or operation at the Property. In other words, there is no causal connection between Plaintiff's alleged economic injury and the actions of JCPB and JCRA. For this reason, Plaintiff's claims against JCPB and JCRA are dismissed with prejudice.

**B. State claims (Counts III–VI)**

A district court may decline to exercise supplemental jurisdiction over a state law claim "under 28 U.S.C. § 1367(c)(3) when it dismisses all claims over which it has original jurisdiction." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 567 (3d Cir. 2017). As previously discussed, Plaintiff's federal claims are dismissed for lack of standing. Plaintiff and Defendants are citizens of New Jersey, so no diversity jurisdiction exists. This Court therefore declines to exercise supplemental jurisdiction over the remaining state claims and dismisses those claims without prejudice.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' Motions are **GRANTED**. An appropriate order follows.

            /s/ Susan D. Wigenton
            **SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc:  José R. Almonte, U.S.M.J.
    Parties